UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Antionette Sabrina Graddick Conyers, | ) | Case No.07-50855 |
| | ) | |
| Debtor. | ) | |
| _____) | | |

## ORDER AND OPINION DENYING CONFIRMATION OF PLAN

THIS MATTER came on before the Court on October 10, 2007, after due and proper notice, before the undersigned Bankruptcy Judge upon Branch Banking & Trust's Objection to Confirmation of Plan. Jewel A. Farlow appeared on behalf of Branch Banking & Trust ("BB&T"), Wendell Wes Schollander, III appeared on behalf of Antionette Sabrina Graddick Conyers (the "Debtor"), and Kathryn L. Bringle appeared as Chapter 13 Trustee. After consideration of the pleadings, memorandums of law, and other matters of record, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

On September 12, 2005, the Debtor purchased a 2005 Chevrolet Trailblazer vehicle (the "Vehicle") for $25,214.09. In order to facilitate the purchase of the Vehicle, the Debtor entered into a dealer financed Retail Installment Sale Contract (the "Contract") with Flow Chevrolet, LLC ("Dealer"); the Dealer later assigned the Contract to BB&T.

As part of the purchase of the Vehicle, the Dealer gave the Debtor a $2,500.00 rebate. In addition, the Debtor traded-in her 2004 Chevrolet Colorado pickup truck, which had substantial negative equity. According to the Contract, the payoff on the 2004 Chevrolet

Colorado pickup truck was $23,258.51. The gross trade-in allowance was $15,300.00. The difference in trade-in allowance and the payoff on the 2004 Chevrolet Colorado was a negative $7,958.51.  The Contract indicates that the $2,500.00 rebate was applied to reduce the negative equity on the 2004 Chevrolet Colorado.  The Debtor ultimately financed an amount totaling $31,762.60, including the purchase price of the Vehicle, tags, license fees, document fees, GAP protection, and the negative equity, at an annual percentage rate of 8.49%, payable over 72 months in monthly installments of $564.89.

On June 4, 2007, the Debtor filed a petition under Chapter 13 of the Bankruptcy Code. The filing was within 910 days of the Debtor's purchase of the 2005 Chevrolet Trailblazer vehicle. On or about August 7, 2007, BB&T filed a proof of claim in the amount of $25,715.93 (the "Claim").

According to the Notice of Proposed Plan and Order Confirming Plan dated August 3, 2007 (the "Proposed Plan"), the Debtor proposes to bifurcate the claim of BB&T by treating its claim as secured in the amount of $17,325.00 with interest thereon at the rate of 9.50% per annum, and the balance of the claim in the amount of $8,390.93 as unsecured. The Proposed Plan requires a minimum dividend of 25% to general unsecured creditors, although it is presently estimated that unsecured creditors will receive a return of 45% of their claim amounts.

On August 13, 2007, BB&T filed a timely Objection to Confirmation of Plan and asserted that 11 U.S.C. § 1325(a) prohibits the Debtor from attempting to bifurcate or cramdown its claim based upon the value of the vehicle.  The Trustee opposed BB&T's Objection and supports confirmation of the Proposed Plan.

**CONCLUSIONS OF LAW**

**A. Background**

With the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress inserted an unnumbered paragraph after § 1325(a)(9) that refers back to § 1325(a)(5) and addresses, among other things, the treatment of claims secured by vehicles in Chapter 13 plans. The "hanging paragraph" after § 1325(a)(9), as it is commonly known, states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

This paragraph prohibits the applicability of § 506 to a claim for the purposes of § 1325(a)(5) if: (1) the creditor has a purchase money security interest, (2) the debt was incurred within 910 days before the filing of the petition, (3) a motor vehicle is the collateral for the debt, and (4) the motor vehicle was acquired for personal use. Standing alone, § 506 allows, among other things, for the bifurcation of an undersecured claim into a secured claim to the extent of the value of the collateral and an unsecured claim to the extent that the value of such creditor's interest is less than the amount of the allowed claim or, in other words, the "cramdown" of a secured claim to the value of the collateral. 11 U.S.C. § 506(a). However, due to the changes effectuated by BAPCPA, a plan that provides for the cramdown of the type of claim described in the hanging paragraph (hereinafter referred to as a "910 claim") does not comply with §

3

1325(a)(5)(B) as modified by the hanging paragraph. *See, e.g., In re Horn*, 338 B.R. 110, 113 (Bankr. M.D. Ala. 2006); *In re Brown*, 339 B.R. 818, 820 (Bankr. S.D. Ga. 2006)*; In re Rowley*, 348 B.R. 479, 481 (Bankr. S.D. Ill. 2006); *In re Robinson*, 338 B.R. 70, 73 (Bankr. W.D. Mo. 2006); *In re Johnson,* 337 B.R. 269, 270 (Bankr. M.D.N.C. 2006); *In re Sparks*, 346 B.R. 767, 769-70 (Bankr. S.D. Ohio 2006); *In re Montoya*, 341 B.R. 41, 43 (Bankr. D. Utah 2006). As a result of BAPCPA, in order to comply with § 1325(a)(5)(B), a debtor must treat a secured creditor with a 910 claim as if that creditor were fully secured.

In this case, the parties do not dispute that the Debtor incurred the debt with BB&T within 910 days of the Petition Date, that the collateral for the debt is a motor vehicle, or that the Vehicle was acquired for the Debtor's personal use. The sole issue is whether BB&T has a purchase money security interest securing the debt. The Debtor contends that she is entitled to cramdown or bifurcate the Claim because the Contract included financing for the negative equity remaining on the Debtor's trade-in vehicle, and therefore, is not a purchase money security interest. Not surprisingly, BB&T asserts that it has a purchase money security interest securing the debt that is the subject of its Claim.

Numerous courts have considered the impact of negative equity on the application of the hanging paragraph and have come to varying conclusions that can be generally sorted into three groups:

(1) <u>Full 910-Claim Status</u>

Several courts have found that claims that include financing for negative equity are entitled to payment in full pursuant to the hanging paragraph. *Gen. Motors Acceptance Corp. v. Peaslee,* 373 B.R. 252 (W.D.N.Y. 2007); *In re Graupner,* No. 4:07-CV-37CDL, 2007 WL

1858291 (M.D.Ga. June 26, 2007); *In re Burt*, No. 07-23193, 2007 WL 3143319 (Bankr. D. Utah Oct. 24, 2007); *In re Pharis*, No. 07-30527 (Bankr. W.D. La. Oct. 10, 2007); *In re Wall*, ___ B.R. ___, 2007 WL 2967235 (Bankr. W.D.N.C. Sept. 17, 2007); *In re Cohrs*, No. 07-21431A13G, 2007 WL 2050980 (Bankr. E.D. Cal. June 25, 2007); *In re Petrocci,* 370 B.R. 489 (Bankr. N.D.N.Y. 2007). This line of cases rests on the common holding that financing for negative equity can be secured by a purchase money security interest. *See Gen. Motors Acceptance Corp.*, 373 B.R. at 262. As a result, a claim that includes financing to payoff negative equity on a trade-in vehicle is protected by the hanging paragraph.

      (2) Dual Status

In a second line of cases, courts have held that a claim that includes financing for negative equity has a "dual status," characterized as partially purchase money and partially non-purchase money. *See CitiFinancial Auto v. Hernandez-Simpson*, 369 B.R. 36 (D. Kan. 2007)*; In re Westfall*, ___ B.R. ___, 2007 WL 2777709 (Bankr. N.D. Ohio Sept. 24, 2007); *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va. 2007)*; In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal. 2007). In contrast to the cases in which courts have allowed full 910 claim status to claims that include negative equity financing, "dual status" courts have held that the payment of negative equity is not part of the purchase price or value given to enable the purchase and, therefore, cannot be secured by a purchase money security interest. *In re Pajot*, 371 B.R. at 154.

      (3) Transformation of the Claim to Non-purchase Money

Lastly, in the case of *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007) the bankruptcy court found, as in the dual status cases, that the funds advanced to pay off negative equity did not give rise to a purchase money security interest because the funds were not part of the purchase

5

price or value given to enable the purchase. *In re Price*, 363 B.R. at 741. Nevertheless, after concluding that the negative equity portion of the claim did not constitute a purchase money security interest, the court applied the transformation rule, which provides that a non-purchase money component of a claim transforms an entire claim into a non-purchase money security interest. *Id*. at 745; N.C. Gen. Stat. § 25-9-103(e)-(g). The court held that pursuant to the transformation rule, the creditor did not have a purchase money security interest in debtors' vehicle in any amount because the claim included funds advanced to payoff negative equity. *In re Price*, 363 B.R. at 741. *See also In re Blakeslee*, ___ B.R. ___, 2007 WL 3133937, *5 (Bankr. M.D. Fla. Sept. 19, 2007) (holding that pursuant to the application of the transformation rule, the inclusion of negative equity in the purchase of a vehicle transforms the entire claim into non-purchase money).[1] As a result, the hanging paragraph did not apply and the creditor's claim could be bifurcated pursuant to § 506. *Id.* at 746.

**B. Analysis**

After consideration, this court finds the reasoning behind the "dual status" position to be the most persuasive of the three. First, the court finds that BB&T does not have a "purchase money security interest" in the negative equity portion of the Claim. The term "purchase money security interest" is not defined by the Bankruptcy Code; therefore, bankruptcy courts consistently look to state law in order to determine whether a creditor has a purchase money security interest. Moreover, a creditor's rights are initially determined by state law. *See Raleigh*

---

[1] The transformation rule was also applied in *In re Peaslee*, 358 B.R. 545 (Bankr. W.D.N.Y. 2006), which has subsequently been reversed by *Gen. Motors Acceptance Corp.*, 373 B.R. at 262 and *In re Westfall*, 365 B.R. 755 (Bankr. N.D. Ohio 2007), which was subsequently amended by *In re Westfall*, ___ B.R. ___, 2007 WL 2777709 (Bankr. N.D. Ohio Sept. 24, 2007).

*v. Ill. Dept. of Revenue*, 530 U.S. 15, 20 (2000)*; Butner v. U.S.*, 440 U.S. 48, 55 (1979). Pursuant to North Carolina law, a "purchase-money obligation" is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." N.C. Gen. Stat. § 25-9-103. Thus, the two essential phrases included in the definition of purchase-money obligation are "the price of the collateral" and "value given to enable the debtor to acquire rights in or the use of the collateral."

First, the court finds that the payoff of negative equity is not part of the "price of the collateral." The North Carolina Retail Installment Sales Act ("NCRISA") provides support for the court's conclusion. Generally, retail installment sales acts or motor vehicle retail installment sales acts are enacted to provide regulation for lenders providing credit to consumers as opposed to commercial loans. Elizabeth R. Schlizt, *The Amazing, Elastic, Ever-Expanding Exportation Doctrine and Its Effect on Predatory Lending Regulation*, 88 Minn. L. Rev. 518, 527 (2004). In North Carolina, the NCRISA governs the sale of goods or services that are purchased primarily for personal, family, household, or agricultural purposes, including motor vehicles. N.C. Gen. Stat. § 25A-2. The NCRISA defines "cash price" as "the price at which the goods or services are offered for sale by the seller to cash buyers in the ordinary course of business and may include: (1) applicable sales, use, and excise and documentary stamp taxes; and (2) the cash price of accessories or related services such as installation, delivery, servicing, repairs, or alterations." N.C. Gen. Stat. § 25A-7 (2005). The definition does not include negative equity. In contrast, some states have enacted a motor vehicle retail installment sales act which does include negative

equity in the definition of "cash sales price." *See, e.g., Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. at 260.

Briefs submitted in support of BB&T point out that the Motor Vehicle Dealers' and Manufactures' Licensing Law defines "retail installment sale" as:

> A sale of one or more motor vehicles to a buyer for the buyer's use and not for resale, in which the price thereof is payable in one or more installments over a period of time and in which the seller has either retained title to the goods or has taken or retained a security interest in the goods under a form of contract designated as a conditional sale, bailment lease, chattel mortgage or otherwise.

N.C. Gen. Stat. § 20-286(15). The NCRISA governs what obligations can be part of a motor vehicle retail installment contract and provides that the term "amount financed" may include the "cash price" as well as, among other things, "[t]he amount actually paid or to be paid by the seller pursuant to an agreement with the buyer to discharge a security interest or lien on property traded in," otherwise known as negative equity. N.C. Gen. Stat. § 25A-8. The court does not dispute that the "amount financed" under the Contract includes negative equity; however, "amount financed" is not equivalent to "cash price." In fact, § 25A-8 makes it clear that the two are separate and distinct, inasmuch as "cash price" is simply one component of the "amount financed." The fact that negative equity may be included in the "amount financed" does not necessarily lead to the conclusion that negative equity falls under the definition of a "purchase money obligation." The definition of purchase money obligation does not make any reference to the "amount financed." *See* N.C. Gen. Stat. § 25-9-103.

Secondly, the court must address whether the funds used to payoff negative equity constitute value given to enable the debtor to acquire rights in or the use of the collateral. UCC Comment Number 3 ("Official Comment Number 3") provides guidance as follows:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

N.C. Gen. Stat. § 25-9-103.  Neither money advanced to pay negative equity nor obligations of a similar nature are included in this list. The examples given in Comment 3 are items that are directly associated with the purchase and retention of a new vehicle or other collateral.  The court does not believe that payment of a pre-existing debt secured by other collateral is similar to those items, that is, "value given to enable the debtor to acquire rights in or the use of the collateral."

In this case, while the loan of additional money was a convenience and an accommodation to the Debtor, the court cannot find that it enabled the Debtor to acquire rights in or the use of the collateral.  Black's Law Dictionary (8th ed. 2004) defines "enable" as "to give power to do something to make able."  An "enabling statute" is a "law that permits what was previously prohibited or that creates new powers; esp., a congressional statute conferring powers on an executive agency to carry out various delegated tasks."  *Id*.  An "enabling clause" is "[t]he part of a statute or constitution that gives governmental officials the power and authority to put the law into effect and enforce it."  *Id.*  The Debtor's trade-in of the 2004 Chevrolet Colorado was certainly not required in order for the Debtor to purchase the Vehicle, nor did it give the Debtor the power or authority to do so.   Allowing the Debtor to rollover negative equity into the

9

new loan was simply an accommodation. It was an arrangement made as a favor to another. While paying off the preexisting debt on the old vehicle was value, it was not value given to enable the Debtor to acquire rights in the collateral. Because the funds used to pay negative equity is not a component of the price of the collateral or value given to enable the debtor to acquire rights in the collateral, the court concludes that those funds are not secured by a purchase money security interest.

Having determined that BB&T does not have a purchase money security interest for the full amount of its claim, it is within the court's discretion to apply either the dual status or transformation rule. N.C. Gen. Stat. § 25-9-103(e)-(g); *In re Price*, 363 B.R. at 745. *But see In re Sanders*, 2007 WL 3047233 (Bankr. W.D. Tex. Oct. 18, 2007) (holding that, because financing used to payoff negative equity is not a purchase money obligation, the hanging paragraph does not apply and the claim is subject to treatment pursuant to § 506(a)). This court agrees with *Pajot* that the dual status rule is a compromise between the two extremes of either "rendering the hanging paragraph almost meaningless through the transformation rule or equipping the hanging paragraph with power beyond its intent by finding negative equity included in the definition of purchase-money security interest." *In re Pajot*, 371 B.R. at 160. Moreover, since Congress, by enacting the hanging paragraph, attempted to ensure that debtors could not load up on vehicle-secured debt prepetition only to cram it down, applying the transformation rule would "re-enable debtors to cram down the secured claim to the collateral value." *Id*. at 159. Applying the dual-status rule preserves the intent of the hanging paragraph to the extent that the collateral is purchase money. *Id*. Thus, the amount of BB&T's Claim attributable to the financing of "negative equity" is not protected by the hanging paragraph and

may be treated as unsecured.  BB&T is entitled to have the balance of its Claim treated as secured.

Lastly, the court must address the allocation of payments made by the Debtor, including the rebate, prior to the Petition Date.  N.C. Gen. Stat. § 25-9-103(e) provides payment allocation procedures for non-consumer goods, but not for consumer goods, such as the Vehicle in this case.  Thus, the court has three options: (1) apply all pre-bankruptcy payments to the purchase-money portion of the claim, (2) apply all pre-bankruptcy payments to the non-purchase money portion of the claim, *see In re Kellerman*, ___ B.R. ___, 2007 WL 3077309 (Bankr. D. Kan. Aug. 15, 2007),  or (3) pro-rate the pre-bankruptcy payments to both the purchase-money portion and the non-purchase money portion.  *See In re Pajot*, 371 B.R. at 160-61.

In this case, the Contract clearly indicates that the $2,500.00 rebate was applied to payoff the negative equity on the 2004 Chevrolet Colorado in the amount of $7,958.51.  The court will apply the rebate as provided by the Contract.  Therefore, the court concludes that, of the $31,762.60 that the Debtor financed, $5,458.51 was utilized to payoff negative equity.   As for payments made by the Debtor subsequently, the court finds that the most equitable manner of allocating payments is pro-rata: such that, in this instance, 17.19% of the payments made prepetition should be applied to reduce the unsecured portion of BB&T's Claim, while 82.81% of the payments made prepetition should be applied to reduce the secured portion of BB&T's Claim.  To the extent that the Debtor's proposed plan does not provide for treatment of BB&T's Claim in accordance with the foregoing, confirmation must be denied without prejudice, and the Debtor shall be given 30 days to file an amended plan.

# SERVICE LIST

Antionette S. Conyers
1234 Brannigan Village Drive
Winston Salem, NC 27127

Wendell Wes Schollander, III
Suite 308
2000 W. First Street
Winston Salem, NC 27104-4225

Jewel A. Farlow
Suite 103 Medical Arts Center
1021 E. Wendover Avenue
Greensboro, NC 27405

James S. Livermon, III
P. O. Box 353
Rocky Mount, NC 27802-0353

Pamela P. Keenan
P.O. Box 19766
Raleigh, NC 27619

Jennifer F. Adams
P. O. Box 20570
Greensboro, NC 27420-0570

Kathryn L. Bringle
P. O. Box 2115
Winston Salem, NC 27102-2115

Michael D. West
P. O. Box 1828
Greensboro, NC 27402